# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RUTH CHARLES,

       Plaintiff,

    v.

COUNTY OF LYCOMING,
PENNSYLVANIA, RYAN
GARDNER, *individually*, and
LISA DIMASSIMO, *individually*,

       Defendants.

No. 4:21-CV-00883

(Chief Judge Brann)

## MEMORANDUM OPINION

### DECEMBER 31, 2025

## I.    BACKGROUND

On May 14, 2021, Plaintiff Ruth Charles ("Charles") filed a four-count complaint against Defendants County of Lycoming ("Lycoming"), Ryan Gardner ("Gardner"), and Lisa DiMassimo ("DiMassimo").[1] On December 13, 2021, Charles filed an amended complaint which expanded the number of counts to seven.[2] Counts One and Two brought claims against Lycoming for discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII").[3] Counts Three and Four were claims against all Defendants for discrimination and retaliation under 42 U.S.C.

---

[1]    Doc. 1 (Compl.).
[2]    Doc. 15 (Am. Compl.).
[3]    *Id.*

§ 1981 ("Section 1981").[4] Counts Five and Six bring state law claims for discrimination and retaliation under the Pennsylvania Human Relations Act ("PHRA") against all three Defendants, while Count Seven brings a claim for aiding and abetting under the PHRA against Garder and DiMassimo.[5]

After the close of discovery, on June 20, 2025, the three Defendants filed a motion for summary judgment. The motion is now ripe for disposition; for the reasons below, it is granted.

## II.    DISCUSSION

### A.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[6] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[7] A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[8] Conversely, to survive summary judgment, a plaintiff must "point to

---

[4]    *Id.*

[5]    *Id.*

[6]    Fed. R. Civ. P. 56(a).

[7]    *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010).

[8]    *Clark v. Mod. Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993).

admissible evidence that would be sufficient to show all elements of a prima facie case under applicable substantive law."[9]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[10] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[11] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the motion."[12] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[13]

### B.    Undisputed Facts

With that standard outlining the Court's framework for review, I now turn to the undisputed facts.

Ruth Charles is a woman of Asian descent who was hired in 2013 as a clerk in the Assessment Office of Lycoming County.[14] In September 2019, Charles received a prior written warning while in that role that precipitated a transfer to a

---

[9]    *Id.*

[10]    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).

[11]    *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

[12]    Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

[13]    Fed. R. Civ. P. 56(c)(3).

[14]    Doc. 35 (Defs.' SOF) ¶¶ 1-2; Doc. 38 (Pl.'s SOF) ¶¶ 1-2.

position as a full-time clerk in the District Attorney's Office.[15] When she joined the office, she was placed in a probation period for 180 days.[16]

On April 6, 2020, one of Charles' co-workers, Karen Chianelli, made a statement in the office that used the racial slur "chinks."[17] The statement was made in the vicinity of Charles and was made at a loud enough decibel to be heard by her.[18] Both Charles and the other worker in the office made immediate reports of the incident to her supervisor DiMassimo, with Charles' report being made via email.[19] Her report included the statements: "I am Asian and that word is one of the most Racist/demeaning words you could use towards an Asian person. I understand it's not about me, but it was very inappropriate to hear."[20] DiMassimo reported the incident to the Human Resources Department and the District Attorney.[21] That same day, DiMassimo also held a meeting with both Charles and Chianelli where Chianelli "acted as if she did nothing wrong."[22] Further, DiMassimo told Chianelli in the meeting that there was zero tolerance for this type of behavior.[23]

While there may have been other instances of discomfort between Charles and Chianelli, there was no other reported incidents of racist remarks being used in the

---

[15]  Doc. 35 ¶¶ 3-4; Doc. 38 ¶¶ 3-4.
[16]  Doc. 35 ¶ 5, Ex. 2.
[17]  Doc. 35 ¶ 9; Doc. 38 ¶ 9.
[18]  Doc. 35 ¶ 10; Doc. 38 ¶ 10.
[19]  Doc. 35 ¶ 11; Doc. 38 ¶ 11.
[20]  Doc. 35 ¶ 12; Doc. 38, Ex. J.
[21]  Doc. 38, Ex. J.
[22]  *Id.*; Doc. 35 ¶ 13.
[23]  Doc. 35 ¶ 14; Doc. 38 ¶ 14.

office.[24] However, superiors in the office began to allege performance issues with Charles' work.[25] On April 30, 2020, these allegations came to a head when an assistant district attorney in the office, Michael Sullivan,  sent an email to District Attorney Gardner describing four instances when Charles had acted inappropriately.[26] The email described her as "very stand-offish" and said that the attorney "avoid[s] her at this point."[27] The four instances of alleged inappropriate conduct were laid out as follows:

> On one recent occasion she got upset while I was talking with the clerk seated next to her. We weren't loud, but she said I needed to leave because she needs quiet to work. It was very awkward and an inappropriate reaction for the situation.

> On another occasion while I was trying to get discovery done with her, I asked her to get an MVR and she told me I can just email the officer and get it myself. She turned away from me and went back to her other work. I had another clerk do it instead.

> On another occasion I asked her to get a lab report which was missing the second page because I needed to list the technician on a subpoena. She asked me if I reached out to the PSP to get it and I told her no, but that I thought she had a system she could pull it from. She was not happy, later that day she "tossed" the paper I gave her (which listed the case) towards me there isn't a report in the system. I told her it had to exist because I have pages 1 and 3 and she said that she couldn't find it and turned her back to me. I asked Jill and Jill got it for me.

> This afternoon I received an email with an ARD question from April McDonald asking if we would have our ARD paperwork ready by June 8th. I was told to check with Ruth. When l approached Ruth and asked her If l could

---

[24]   Doc. 35 ¶¶ 17-18; Doc. 38 ¶¶ 17-18.
[25]   Doc. 35 ¶ 19; Doc. 38 ¶ 19.
[26]   Doc. 35 ¶ 20, Ex. 9; Doc. 38 ¶ 20.
[27]   Doc. 35, Ex. 9.

ask her a question about an email from April McDonald, and she got defensive. I tried to explain what I needed and she made statements that she saw the email and she wasn't going to respond because "I don't do that because I don't know what that is so I just don't do it unless It is a DUI case"; "I am just a little person and I don't do things like that"; "attorneys get paid to figure that stuff out", etc. I don't remember all of her comments but they were all designed to push me away and not bother her. All I wanted to know was if there was any paperwork our office needed to do so I could respond to April. Ruth clearly didn't want to discuss it. She said she filed what she was supposed to file in PMS today and that I got a copy so she is not involved any further. Again, it was not a helpful interaction.[28]

On May 1, 2020, a separate email from Sullivan to DiMassimo described another issue where Charles had not provided requested documents that were needed for court hearings.[29] That same day DiMassimo sent an email to Gardner reporting a meeting she had with Charles to discuss some of the issues with her work.[30] The email began by noting that "Charles was once again extremely hostile" in the office and that "this was not the first time our staff has encountered this behavior from Ruth."[31] At the meeting, Charles was said to have broken down into tears and brought up an issue about having to come into the office on that day.[32] Charles said that it was "bullshit " that she had to come into the office.[33] DiMassimo stated that Charles had to come into the office on a day outside of her normal weekly rotation because she "needed a clerk."[34] A final email was sent by a paralegal in the office,

---

[28] *Id.*
[29] Doc. 35 ¶ 21, Ex. 10; Doc. 38 ¶ 21.
[30] Doc. 35 ¶ 22, Ex. 11; Doc. 38 ¶ 22.
[31] Doc. 35, Ex. 11.
[32] *Id.*
[33] *Id.*
[34] *Id.*

Jill Schriner, recounting three separate instances of alleged work issues.[35] These three reports also involved Charles' sending work to be done elsewhere and questioning her work responsibilities.[36]

On May 1, 2020, Charles was called into a meeting with then District Attorney Gardner and informed that she was being terminated for insubordination.[37] Gardner told Charles that this "was the worst case of insubordination he had ever seen in his 30 year career of being an attorney."[38] Gardner made the ultimate decision to terminate Charles, but did so with the input of DiMassimo.[39]

## C.    Analysis

Respondents argue that Charles has failed to produce admissible evidence to establish a prima facie case for any of the seven counts in her amended complaint.[40] Because the same analytical framework applies to Title VII, Section 1981, and the PHRA claims, each claim of discrimination and retaliation will be addressed together.[41] Finally, I will analyze the aiding and abetting PHRA claim brought against Gardner and DiMassimo.

---

[35]  Doc. 35 ¶ 23, Ex. 12; Doc. 38 ¶ 23.

[36]  *See* Doc. 35, Ex. 12.

[37]  Doc. 35 ¶ 26; Doc. 38 ¶ 26.

[38]  Doc. 35, Ex. 5 (Charles Dep.) 120235-121:3.

[39]  Doc. 35 ¶¶ 27, 30; Doc. 38 ¶ 29.

[40]  Doc. 36, at 7.

[41]  *Qin v. Vertex, Inc.*, 100 F.4th 458, 470 (3d Cir. 2024); *Atkinson v. Lafayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006) ("Claims under the PHRA are interpreted coextensively with Title VII claims."); *Lewis v. Univ. of Pittsburgh*, 725 F.2d 910, 915 n.5 (3d Cir. 1983) (explaining that actions brought under § 1981 require the same elements of proof as a Title VII action).

### 1. Discrimination Claims

Charles brings discrimination claims under Title VII, Section 1981, and the PHRA.[42] Nested within the three claims are two theories of discrimination—hostile work environment and disparate treatment.[43] Each theory will be addressed separately.

### a. Hostile Work Environment

In both Charles' Title VII and Section 1981 discrimination claims she includes an argument that various defendants "subjected her to a hostile work environment" due to her race.[44] To establish a prima facie case of hostile work environment, "the plaintiff must establish that 1) the employee suffered intentional discrimination because of his/her [race], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability."[45]

Where this claim ultimately rises or falls is on the second element—whether the discrimination was severe or pervasive. "Whether an environment is hostile requires looking at the totality of the circumstances, including: 'the frequency of the

---

[42] All three claims are brought against Lycoming, but only the 1981 and PHRA discrimination claims are brought against Gardner and DiMassimo. *See* Doc. 15.

[43] *See* Doc. 15 ¶¶ 54, 61. The PHRA claim includes only the disparate treatment theory of discrimination. *See id.* ¶ 67.

[44] *See* Doc. 15 ¶¶ 54, 61.

[45] *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013); *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017).

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"[46] While one instance of severe harassment can be sufficient to establish such a claim, the plaintiff must establish that the incident was "extreme [enough] to amount to a change in the terms and conditions of employment."[47]

Despite Charles' unsupported claims to the contrary, the undisputed facts of this case show that there was one isolated incident of discriminatory conduct—when Charles' co-worker, Karen Chianelli, made an inflammatory set of statements using the word "chink(s)."[48] While this is an offensive word to use in any environment, this singular incident is not severe enough to allow for the second element of the hostile work environment standard to be met.[49] Though clearly an offensive and

---

[46] *Castleberry*, 863 F.3d at 264 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

[47] *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Charles focuses on the *Castleberry* case to advance here argument that a singular instance of discriminatory conduct can serve as the basis of a hostile work environment claim. *See* Doc. 37, at 5-6. While the Court acknowledges that this can be the case, that case is distinguishable from the case at hand because here the employee's supervisor did not make the discriminatory statement and there was no accompaniment of threats of termination present. *See id.* The Third Circuit has found that these differences can be determinative in a hostile work environment analysis. *Gladden v. Ambler Healthcare Grp., LLC*, 2024 U.S. App. LEXIS 1638, at *4-5 (3d Cir. 2024).

[48] Doc. 35 ¶ 9; Doc. 38 ¶ 9.

[49] *Compare Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 182 (3d Cir. 2020) (holding that obviously racial comments, including being greeted with "Hey Arabia Nights" or "Hey, Big Egypt" and condescending questions about technology in the plaintiff's home country, were not so severe as to make a hostile work environment) *and Qin v. Vertex, Inc.*, 100 F.4th 458, 470-71 (3d Cir. 2024) (holding that three obviously racist statements using phrases like "China Man" in an office with only one Chinese employee were not severe or pervasive enough to establish a hostile work environment) *with Castleberry*, 863 F.3d at 265 (holding that the use

humiliating comment, Charles has provided no tangible evidence that the statements of Chianelli interfered with her work performance after the day the incident occurred or injected any hostility or abuse into the work environment.[50] Combined, the evidence — or lack thereof —proffered by Charles is insufficient to qualify the discrimination as severe.[51] The isolated statement is also simply far too infrequent to be pervasive enough to meet the standard.[52] As the United States Court of Appeals for the Third Circuit has said, "it is a rare and extreme case in which a single incident will be so severe that it would … make the working environment hostile."[53] The matter before the Court is the unfortunate case of an isolated offensive comment over an employee's seven years of employment that does not rise to the level of creating a hostile work environment.[54] As such, these discrimination claims cannot

---

of an unambiguous racial epithet by a supervisor, immediately followed by a threat of termination, created a hostile work environment).

[50]  *See Qin*, 100 F.4th at 471.

[51]  *See id.*

[52]  *See id.* ("three comments over the course of almost nineteen years simply do not reach the requisite level of frequency or severity"); *Nitkin v. Main Line Health*, 67 F.4th 565, 571 (3d Cir. 2023) (determining that seven comments over three-and-a-half years were neither severe nor pervasive enough to constitute a hostile work environment).

[53]  *Ali*, 957 F.3d at 181 (quoting *Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 626 A.2d 445, 455 (1993)) (internal quotation marks omitted). The Court wishes to note that whether the content of the statements was "I can't stand the chinks" and "I can't believe these chinks" as Charles alleged or another statement using the racial slur is ultimately immaterial. *See* Doc. 37 at 5. Both parties agree that this was a patently offensive statement, and the Court's analysis should not be taken as anything other than a complete condemnation of the use of the word. However, whether its use created a hostile work environment is a separate question from its offensiveness. Based on the Court's analysis, the former question must be answered in the negative.

[54]  *See id.*

survive the current summary judgment motion through a hostile work environment theory.

### b.    Disparate Treatment

In all three discrimination claims, Charles alleges a disparate treatment theory of discrimination.[55] "A disparate treatment violation is made out when an individual of a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion."[56] This claim requires "proof of the employer's discriminatory motive," which "can either be shown by direct evidence … or through indirect or circumstantial evidence."[57]

When there is a lack of direct evidence of disparate treatment, courts use the *McDonnell Douglas* burden-shifting framework.[58] Under this test, "the plaintiff must first establish a prima facie case of discrimination by showing that: (1) s/he is a member of a protected class; (2) s/he was qualified for the position s/he sought to attain or retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination."[59] If they are able to do so, "then an inference of discriminatory motive arises and the burden shifts to the defendant to articulate a legitimate, non-

---

[55] *See* Doc. 15 ¶¶ 54, 61, 67.

[56] *E.E.O.C. v. Metal Serv. Co.*, 892 F.2d 341, 347 (3d Cir. 1990) (citing *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335–36 n. 15 (1977)).

[57] *Id.*

[58] *Qin v. Vertex, Inc.*, 100 F.4th 458, 472-73 (3d Cir. 2024).

[59] *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

discriminatory reason for the adverse employment action."[60] Finally, if the defendant accomplishes this, "the inference of discrimination drops and the burden shifts back to the plaintiff to show that the defendants' proffered reason is merely pretext for intentional discrimination."[61]

Here too, Charles' claim rises and falls on a single element—the fourth element requiring that the action occurred under circumstances that could give rise to an inference of intentional discrimination.[62] A plaintiff may show that an inference of intentional discrimination is possible "by demonstrat[ing] that similarly-situated persons outside the protected class were treated more favorably."[63] Charles alleges that there are other ways to show that an inference of intentional discrimination, but provides no legal support for such proposition.[64] The Court recognizes that this test is not "rigid, mechanized, or ritualistic" so it agrees that it is possible to prove this interference in another fashion.[65] However, when a comparator is not offered, what is required is the offering of "sufficient evidence" to allow "the court [to] infer that

---

[60]   *Id.*

[61]   *Id.*

[62]   The Court notes that elements one through three have all likely been met here. Charles is an Asian woman—an assuredly protected class, she was clearly qualified for the position as she was hired to the position and worked there for seven years, and she suffered the adverse employment action of termination. Given that defendants did not present any argument to the first three elements of the prima facie case, they seemingly concede that these elements have been made out. *See* Doc. 36, at 11-14.

[63]   *Qin*, 100 F.4th at 474; *Collins v. Kimberly-Clark Pennsylvania, LLC*, 708 F. App'x 48, 52 (3d Cir. 2017).

[64]   *See* Doc. 37, at 11. The singular case she cites does not even analyze the fourth prong. *See Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403 (3d Cir. 1999).

[65]   *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577 (1978).

if the employer's actions remain unexplained, it is more likely than not that such actions were based on impermissible reasons."[66]

In the present case, Charles does not offer a direct comparator, but does indirectly imply that Chianelli could be one.[67] While the Court recognizes that comparators "need not be identical [, they] must be similarly situated in all material respects."[68] At first blush, it seems as though Chianelli would be a suitable comparator given their seemingly identical supervisor, job responsibilities, and standards that they were subject to.[69] Nevertheless, the actions leading to their respective punishments for their conduct are not similar enough. While both employees used words that the office disapproved of, the overriding difference is the additional infractions having to do with job performance that Charles' record reflects. If she had been fired solely because of the use of the word "bullshit," Chianelli would be a perfect comparator for Charles. However, this was not the case, and Charles' record indicates multiple additional infractions based on job performance and insubordination. No similar incidents regarding Chianelli have been shown to have occurred. Ultimately, they may have been similarly situated in

---

[66] *E.E.O.C. v. Metal Serv. Co.*, 892 F.2d 341, 348 (3d Cir. 1990).

[67] *See* Doc. 37, at 11.

[68] *Qin*, 100 F.4th at 474 (quoting *In re Tribune Media Co.*, 902 F.3d 384, 403 (3d Cir. 2018)) (internal quotation marks omitted).

[69] *Id.*

their job titles and roles, but their conduct was not similar enough to say that they were materially similarly situated and treated differently.[70]

Further, Charles provides no — let alone sufficient — evidence to allow the Court to utilize a different method to find that "it is more likely than not that such actions were based on impermissible reasons."[71] This fact, combined with the lack of a valid comparator, leads the Court to the belief that Charles has not sufficiently made out the fourth element of the prima facie discrimination claim. This finding is sufficient to grant summary judgment to the employer,[72] and, as such, the discrimination claims cannot survive this summary judgment motion on a disparate treatment theory either.[73]

---

[70] *See Glass v. First Jud. Dist. of Pennsylvania*, 734 F. App'x 136, 140 (3d Cir. 2018).

[71] *E.E.O.C. v. Metal Serv. Co.*, 892 F.2d 341, 348 (3d Cir. 1990).

[72] *See Glass*, 734 F. App'x at 140; *Ammar v. McDonough*, No. CV 22-1608-GBW, 2025 WL 692084, at *13 (D. Del. Mar. 4, 2025).

[73] Even if the Court were to find that Charles has made out a prima facie case of discrimination, it would still find that she failed to prove that the defendants' legitimate, nondiscriminatory proffered reason is merely pretext. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). Regarding the issue of pretext, Charles first contends that the termination was in direct conflict with the County's own policies. *See* Doc. 37, at 14. This is simply not the case, as their disciplinary policy plainly allows for termination upon a singular incident of insubordination to a supervisor. *See* Doc. 37, Ex. N, at 3. She next claims that the timing of the complaints and decision proves that it is pretext. *See* Doc. 37, at 15. The timing of these events is short in duration, but it does not rebut the adequacy of the evidence supporting termination. The timing discrepancies can likely be explained by the recollection difficulties of remembering events that happened half a decade prior. But even if the timing were odd, it does not allow the Court "to infer that discrimination was more likely than not the motivating factor or determinative cause of the adverse employment action" — a requirement to avoid summary judgment under this standard. *Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994). Because Charles has failed to provide sufficient doubt that the proffered reasons were pretext, summary judgment would be proper even if a prima facie case had been made out here. *See id.*

Because Charles' discrimination claims cannot survive summary judgment under either hostile work environment or disparate treatment theories, Defendants' summary judgment motion is granted with respect to Charles' discrimination claims.

## 2.   Retaliation Claims

Charles also brings retaliation claims under Title VII, Section 1981, and the PHRA.[74] In retaliation cases, courts also use the *McDonnell Douglas* burden-shifting framework when there is no direct evidence of retaliation, as is the case here.[75] Under this framework, the plaintiff "first must establish a prima facie case by showing (1) [that she engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."[76] Similar to disparate treatment claims, if the plaintiff can make out a prima facie case, the burden shifts to the defendant to proffer a legitimate, non-retaliatory rationale for the adverse action and then "the burden shifts back to the plaintiff to demonstrate that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action."[77]

---

[74] Similar to the discrimination claims, all three retaliation claims are brought against Lycoming, but only the 1981 and PHRA claims are brought against Gardner and DiMassimo. *See* Doc. 15.

[75] *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015).

[76] *Id.* (quoting *Marra v. Phila. Hous. Auth.,* 497 F.3d 286, 300 (3d Cir.2007)) (internal quotation marks omitted).

[77] *Id.*

Both parties agree that Charles has satisfied the first and second elements of the prima facie case.[78] Therefore, whether a prima facie case is made out is dependent on the third factor—whether she has established a causal connection between the employee's protected activity and the employer's adverse action. To establish the third prong, courts "consider a broad array of evidence."[79] One such type of evidence is "[w]here the temporal proximity between the protected activity and the adverse action is unusually suggestive."[80] That temporal proximity can, by itself, in some instances establish a prima facie case of retaliation."[81] However, there is no set number of days that are considered to be unusually suggestive.[82] Where the temporal proximity is not unusually suggestive, "[a]mong the kinds of evidence that a plaintiff can proffer are intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus."[83]

---

[78]   *See* Doc. 36, at 16.

[79]   *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (quoting *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 284 (3d Cir.2000)) (internal quotation marks omitted).

[80]   *Id.* at 232.

[81]   *Clark County School Dist. v. Breeden,* 532 U.S. 268, 273-74 (2001) (temporal proximity alone, when "very close," can in some instances establish a prima facie case of retaliation).

[82]   *LeBoon*, 503 F.3d at 232 ("There is no bright line rule as to what constitutes unduly suggestive temporal proximity").

[83]   *Id.*

Here, the temporal proximity could be unusually suggestive. Charles took her protected activity—informally complaining to DiMassimo about the discriminatory comments made by Chianelli—on April 6, 2020.[84] On May 1, 2020, the adverse employment action was taken—Charles was fired.[85] This four-week period is within the temporal proximity that courts around the Third Circuit have found to be unusually suggestive.[86] This close timeframe can be, and is here, sufficient "to create an inference of causality."[87] Therefore, all three elements of a prima facie case could be found to have been met.

The next step under the *McDonnell Douglas* framework is for the defendants to put forth a legitimate, nonretaliatory reason for the adverse action.[88] They have done just that by providing evidence of the multiple instances of insubordination. Thus, the burden shifts yet against. Finally resting with Charles "to demonstrate that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action."[89] This is ultimately where her retaliation claims crumble.

---

[84] Doc. 35 ¶ 9; Doc. 38 ¶ 9.

[85] Doc. 35 ¶ 26; Doc. 38 ¶ 26.

[86] *Fasold v. Just.*, 409 F.3d 178, 190 (3d Cir. 2005) (finding that a three-month period may justify "an inference of retaliation"); *see also Nesselrotte v. Allegheny Energy, Inc.*, No. CIV A 06-01390, 2009 WL 703395 (W.D. Pa. Mar. 16, 2009) (finding that a less than three month period between the protected activity and the action satisfied the causation prong); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (finding that two months and one week was sufficient temporal proximity to establish causation).

[87] *LeBoon*, 503 F.3d at 232; *Clark County School Dist.*, 532 U.S. at 273-74.

[88] *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015).

[89] *Id.*

"[T]he plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons … was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)."[90] To do this, the "plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence."[91]

Charles has provided almost no evidence that the Defendants' proffered explanation was false, let alone that retaliation was the real reason for her ultimate termination. She argues that the "insubordination" reasoning provided for her dismissal "was a label slapped on Plaintiff as a result of her complaining about discrimination."[92] But to support this, Charles only sets forth two things: (1) that the timing of the complaints and termination are suspicious and (2) that Chianelli was not fired for her use of a racial slur.[93] Neither of these purported submissions of evidence fully address the incidents demonstrating insubordination and, combined

---

[90] *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

[91] *Id.* at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis–Cohen,* 983 F.2d 509, 531 (3d Cir.1992)) (internal quotation marks omitted).

[92] Doc. 37, at 19.

[93] *See id.* at 19-20.

with all of the other evidence in the record, would not allow a reasonable factfinder to determine that Defendants' reasoning was simply pretext.

Ultimately, the fact that Charles complained about having to show up, in-person, to her job and was fired the next day, does not throw into question the proffered reason for her termination.[94] It is also unsurprising that a manager would ask his subordinates to put complaints into writing prior to dismissing an employee.[95] Finally, as previously stated, Charles and Chianelli were not entirely similarly situated — Chianelli lacked any of the reports of insubordination that Charles had in her record. That one was only reprimanded and the other fired cannot serve as the basis to find that discrimination or retaliation was the determinative cause of the termination when the reported misconduct is just of a different nature and kind. Looking past the proffered arguments, the record is devoid of any further evidence that could rebut the proffered reasoning.[96]

---

[94] *See Fuentes*, 32 F.3d at 766.

[95] *See id.*

[96] The Court notes that it did consider all of the evidence in the record to adduce evidence of the proffered reason being pretext. It could discern no other evidence that could or should have been argued. The evidence proffered in other sections of the brief in opposition to this motion also do not support a finding of pretext. For example, Charles repeatedly argues that there are discrepancies in the reasons given for the firing and the timing of when the termination was decided. *See* Doc. 37, at 12, 20. There are simply no inconsistencies in the record on these issues that are not inconsequential differences. Notably, whether the decision to terminate Charles was made on the night of April 30 or the morning of May 1 is ultimately an inconsequential distinction in a determination of whether the proffered reasoning is pretext. Further, there are no discrepancies in the reasons given for the actual termination. This is but one example of the lack of evidence in the record supporting Charles' ultimate contention that insubordination was a pretextual reason for her termination.

In sum, Charles has submitted no evidence raises a material issue of fact related to the ultimate reason for Charles' firing. As such, her three retaliation claims fail the *McDonnell Douglas* test and cannot survive summary judgment.

### 3.    Aiding and Abetting Claim under the PHRA

Charles' final count of her amend complaint argues that Gardner and DiMassimo violated the PHRA by aiding and abetting the allegedly discriminatory firing. The PHRA "makes it unlawful [f]or any person, employer, employment agency, labor organization or employe, [sic] to aid, abet, incite, compel or coerce the doing of ... an unlawful discriminatory practice."[97] However, "[f]or liability to be imposed under the PHRA on an aiding and abetting theory, there must be a cognizable predicate offense, i.e., a violation by the employer of the PHRA."[98] This Court has just found that Lycoming County "has not violated the PHRA at the institutional level," nor has it violated Title VII or Section 1981.[99] Therefore, the

---

[97]  *De Piero v. Pennsylvania State Univ.*, 769 F. Supp. 3d 329, 356 n.9 (E.D. Pa. 2025) (quoting 43 Pa. Stat. Ann. § 955(e)) (internal quotation marks omitted).

[98]  *Id.* (quoting *Williams v. Aramark Campus LLC*, 2020 WL 1182564, at *10 (E.D. Pa. Mar. 12, 2020)) (internal quotation marks omitted); *Kaniuka v. Good Shepherd Home*, No. 05–CV–02917, 2006 WL 2380387, *10 (E.D. Pa. Aug. 15, 2006) ("Individual defendants cannot violate PHRA section 955(e) when there is no corresponding section 955(a) violation"). The Court's finding that there was no predicate PHRA violation by the employer makes it unnecessary to determine whether Gardner and DiMassimo are supervisory employees for the purposes of the PHRA. *Kaniuka*, 2020 WL 1182564, at *10.

[99]  *De Piero*, 769 F. Supp. 3d at 356 n.9.

claims for individual liability under the PHRA § 955(e) necessarily must fail,[100] and summary judgment will be granted for Count VII.[101]

## III.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[100] *See id.*; *Williams*, 2020 WL 1182564, at *10; *Lombard v. Lassip, Inc.*, No. 17-964, 2017 WL 6367956, at *5 (E.D. Pa. Dec. 13, 2017).

[101] Even if the Court did not find that there was a lack of predicate offense that merited granting summary judgment over Count VII, the Court would find that with there would "exist[] no independent jurisdictional basis to maintain a PHRA claim against [Gardner and DiMassimo] in federal court" and would decline to exercise supplemental jurisdiction over Count VII with summary judgment being granted to the Defendants on Counts I–VI. *Dici v. Com. of Pa.*, 91 F.3d 542, 553 (3d Cir. 1996).